Filed 3/8/19; Certified for Publication 3/27/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LAURENCE JOHNSON,<br><br>   Plaintiff and Appellant,<br><br>        v.<br><br>THE RAYTHEON COMPANY, INC. et al.,<br><br>   Defendants and Respondents. | B281411<br><br>(Los Angeles County<br> Super. Ct. No. BC562444) |

APPEAL from judgments of the Superior Court of Los Angeles County, Stuart M. Rice, Judge.  Affirmed.

Robinson Calcagnie, Mark P. Robinson, Kevin Calcagnie, Genevieve Outlaw; Steinbrecher and Associates and Edward Steinbrecher for Plaintiff and Appellant.

Horvitz & Levy, Mitchell C. Tilner, Stephen E. Norris; Burke, Williams & Sorensen, Mark J. Mulkerin, and Brian Hamblet for Defendant and Respondent The Raytheon Company Inc.

Yukevich Cavanaugh, James J. Yukevich, Raymond H. Hua and Michael D. Johnson for Defendant and Respondent Systems XT, Inc.

———————————————

Plaintiff and appellant Laurence Johnson was seriously injured when he fell from a ladder at work.  At the time, Johnson was employed by an independent contractor which provided maintenance engineering staff for defendant and respondent The Raytheon Company, Inc.  Raytheon was undergoing a renovation project of a water cooling tower on its premises.  The prime contractor for the water cooling tower project was defendant and respondent Systems XT, Inc.

In the course of Johnson's maintenance engineering work, he investigated a low water level alarm by looking over the water cooling tower wall.  To do so, he used an unsafe partial extension ladder which had been left at the wall by one of Systems XT's subcontractors, and he fell when the ladder slipped.  Johnson sued multiple defendants, alleging they were all responsible for the unsafe conditions which led to his fall.  Two of the defendants, Raytheon and Systems XT, obtained summary judgment, and Johnson appeals.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.      The Parties**

Before we discuss the facts in detail, it is useful to identify all of the entities involved and their contractual relationships.

Johnson was a maintenance engineer employed by ABM Facilities Services, Inc., an independent contractor which provided control room staff to Raytheon.  ABM is not a defendant

2

in this case; Johnson received workers' compensation benefits through ABM for the injuries he sustained in his fall.

Separate and apart from Raytheon's contractual relationship with ABM was Raytheon's contractual relationship with Systems XT. Systems XT is a mechanical contractor which Raytheon hired to remove and replace its water cooling towers. It was the prime contractor on the job.[1]

Two of Systems XT's subcontractors are also defendants in this case, although they are not parties to this appeal. The first is Brownco Construction Company, Inc. which was the concrete subcontractor, and the entity which left the unsafe partial extension ladder at the cooling tower wall. The second is Power Edge Solutions, Inc. The water cooling tower required constant electronic monitoring of its water level. Power Edge Solutions was the subcontractor which installed electronic monitors as the water cooling tower renovation project progressed. This is relevant because Johnson alleges the alarm to which he was responding was a false alarm, which only occurred due to Power Edge Solutions' alleged faulty wiring of the water level monitor.

## 2. Johnson's Accident[2]

Johnson worked the graveyard shift, monitoring various computers in the control room in Raytheon's Building E5. At

---

[1] At deposition, the president of Systems XT explained that it was the "prime," rather than the "general" contractor on the job. Systems XT distinguishes between the two on the basis that it did not have a general contractor's license, and did all the work through subcontractors.

[2] We take our discussion of the facts largely from the undisputed facts and those facts on which Johnson relies. We discuss disputes in the facts where necessary.

3

around 2:50 a.m. on February 20, 2013, he started receiving low water level alarms pertaining to the water cooling towers. He was unable to resolve the alarms, so he telephoned his ABM supervisor, Robert Whitney. Whitney told him to do whatever he thought he should do. Johnson chose to go to the cooling tower wall directly, and look over the wall to verify the water level.

Johnson saw a ladder leaning against the cooling tower wall. In the past, there had been a Raytheon-owned platform ladder at the wall.[3] There was no platform ladder at the wall when Johnson approached. Instead, there was what appeared to be a straight ladder, which Brownco had left against the cooling tower wall. It turns out the ladder was not a straight ladder, but the upper half of an extension ladder. As it was intended for use only with the bottom half of the extension ladder, it did not have proper footing. In fact, the upper half of the extension ladder leaning against the wall had a caution label on it, stating, in all capital letters, "CAUTION" and "THIS LADDER SECTION IS NOT DESIGNED FOR SEPARATE USE." Johnson did not see the caution label, nor did he move or adjust the ladder to make certain it was secure prior to using it. This was so even though Johnson noticed that the ground was wet; it had rained earlier.

Johnson ascended the ladder the few steps needed to look over the 8-foot wall. He looked over the wall and confirmed there was no problem with the water level. While he was climbing down the ladder, it slid out, causing him to fall on top of the ladder and sustain serious injuries. He was discovered some time later by a security guard who heard his screams in the distance.

---

[3]    A platform ladder has four legs, and steps leading up to a platform with handrails.

Whitney later had Power Edge Solutions investigate the water level monitor. Power Edge Solutions reported to him that the connections on the sensor had corroded.[4] When Power Edge Solutions replaced the wires, the false alarms stopped.

Whitney completed an incident report regarding Johnson's accident. When asked why the unsafe conditions occurred, he responded, "Connections on the level sensor to sump level corroded, rain and tower runoff to wet concrete surface, lack of lighting and poor choice of ladder used."

### 3.    Allegations of the Complaint

Johnson originally brought suit against Raytheon, which removed the case to federal court. The matter was subsequently remanded after Johnson added additional defendants whose presence defeated diversity jurisdiction. The operative complaint is the first amended complaint, which named as defendants Raytheon, Systems XT, Brownco, and Power Edge Solutions.

As against Raytheon, Johnson alleged causes of action for negligence and premises liability.[5] Johnson alleged that Raytheon was negligent in the "retention of their control of the subject premises, including the water cooling tower, the worksite,

---

[4]    Although not relevant to the issues on appeal, this fact is disputed. ABM's log book states that Power Edge Solutions found corrosion. However, the Power Edge Solutions employee who actually troubleshot the sensor did not see any corrosion. He testified that the wires did not look bad to him, but he followed "good practice," and cut the wires, cleaned them off, and reattached them.

[5]    Johnson also alleged a cause of action for negligence per se, which is not pursued on appeal.

5

the procedures, and the unsafe equipment including the subject ladder, and Defendant Raytheon Company affirmatively contributed to causing [his] severe and catastrophic injuries." Johnson's complaint, however, did not specify any way in which Raytheon "affirmatively contributed" to his injuries.

As to Systems XT, Johnson alleged that it was the general contractor and therefore responsible for all of the work of its subcontractors, including Brownco and Power Edge Solutions. Johnson alleged Systems XT was negligent in two specific ways: (1) in allowing the sensor wires to be hooked up in a manner in which they were exposed to the elements, such that a false alarm was generated; and (2) in failing to supervise the construction site and require Brownco to put its ladders away at the end of each day.[6]

Raytheon and Systems XT each moved for summary judgment. Although the briefing was virtually simultaneous, we discuss the proceedings on, and resolution of, each motion separately.

## 4. Raytheon's Motion for Summary Judgment

In *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*), our Supreme Court held that when an employee of an independent contractor hired to do dangerous work suffers a

---

[6] Johnson alleged that Systems XT was also negligent for failing to install a "visual water level monitoring system," which would enable the maintenance engineers to see the water level in the water cooling tower without looking over the wall. It immediately installed such a system after Johnson's accident. Perhaps in recognition that such a visual monitor was not required in the water tower contract specifications, and that subsequent remedial measures are not admissible (Evid. Code, § 1151), Johnson does not pursue this theory on appeal.

6

work-related injury, the employee cannot recover against the individual who retained the independent contractor. (*Id*. at p. 692.) As Johnson was injured during the course of his employment with ABM, an independent contractor retained by Raytheon, Raytheon sought summary judgment on the basis of *Privette* and its progeny.

In opposition, Johnson argued that *Privette* was inapplicable, because his theory of liability against Raytheon was not one of vicarious liability, but direct liability for Raytheon's own breach of duties owed to Johnson. Specifically, the *Privette* doctrine allows for liability when the hirer of the independent contractor retained control over safety conditions at the worksite, and negligently exercised that retained control in a manner which affirmatively contributed to the employee's injuries. (*Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 202 (*Hooker*).) Johnson took the position that Raytheon had retained control over which ladders ABM employees could use to look over the water cooling tower wall. Johnson argued that Raytheon had retained that control by generally leaving a platform ladder at the wall for ABM's use. Johnson believed that Raytheon's course of conduct of leaving a platform ladder at the wall constituted an implied agreement to always have one present, on which ABM's engineers relied. Johnson then argued that Raytheon was negligent in failing to have a platform ladder at the wall on the night of the accident. However, Johnson conceded in his opposition that "[i]t is unknown why a platform ladder was not present at the time of the accident." He simply argued that "Raytheon's omission in not having a platform ladder present is the basis of its negligence."

7

Because Johnson's theory of liability against Raytheon was based on Raytheon's alleged failure to leave a platform ladder at the accident scene, evidence was submitted as to the presence and availability of other ladders at the Raytheon plant.[7] Specifically, there was a great deal of evidence that there were other ladders available for Johnson's use at Raytheon.[8] Johnson himself testified that he was aware of other ladders on Raytheon's premises that night, including platforms. He did not know where the platform ladders were stored. However, A-frame ladders were stored in the boiler room and the chiller room in the E5 building, downstairs from the control room where Johnson had been working. In fact, in walking to the water cooling tower, Johnson could have walked through the chiller room where some A-frame ladders were stored. Another ABM engineer agreed that

---

[7] Raytheon also submitted evidence regarding the ladder training Johnson had received, to establish that Johnson was at fault for using the partial extension ladder without first inspecting it. It was undisputed that ABM had given Johnson ladder training via a PowerPoint presentation from Summit Training Source, Inc. The training included a slide on Ladder Selection, which stated, "Inspect feet for damage, and check that slip-resistant pads are secure." It also says, "Finally, when choosing a ladder always inspect for damage." Johnson completed his ladder training in August 2012, some six months prior to his accident, and received 100 percent on his test.

[8] Raytheon did not include in its separate statement anything regarding the availability of other ladders; this was likely because it was not until Johnson's summary judgment opposition that he first raised the theory that Raytheon affirmatively contributed to the accident by not making a platform ladder available at the wall.

8

ABM employees could simply go into the room and obtain A-frame ladders; ABM had the necessary keys.  Raytheon's manager of central plant operations testified that Raytheon also kept some platform ladders inside the E5 building and that Johnson had access to them.

In reply in support of its motion for summary judgment, Raytheon argued that Johnson's concession that it was unknown why there was no platform ladder at the wall at the time of the accident was dispositive.  *Hooker* provides for hirer liability only when the retained control is negligently exercised in a manner that affirmatively contributes to the accident; Raytheon argued there could be no affirmative contribution when there is no evidence that Raytheon itself removed the platform ladder.

The trial court granted the motion, concluding that the *Privette* doctrine barred Johnson's suit against Raytheon.  The court specifically held that Johnson failed to raise a triable issue of fact that any retained control (in terms of providing a platform ladder at the wall) affirmatively contributed to his injuries.  The mere facts that (1) Johnson had used Raytheon's platform ladders before, and (2) there was not one present at the cooling tower wall on the night of the accident are insufficient to establish affirmative contribution.

**5.      Systems XT's Motion for Summary Judgment**

Like Raytheon, Systems XT moved for summary judgment on the basis of *Privette*.  However, it was something of a challenge for Systems XT to put itself in the legal position of a hirer of an independent contractor whose employee was injured.  To be sure, Johnson sought to hold Systems XT vicariously liable for the negligence of its subcontractors, Brownco and Power Edge Solutions.  But Johnson was not an employee of those

9

subcontractors, or any other subcontractor who ultimately reported to Systems XT. Although Johnson was employed by ABM, a contractor on the Raytheon campus, ABM was not part of the water cooling tower renovation project and did not answer to Systems XT. Systems XT argued that it was Raytheon's agent, and therefore entitled to Raytheon's *Privette* immunity when it stood in Raytheon's shoes, but we believe the more correct argument was Systems XT's alternative one: that even assuming *Privette* does not apply, Systems XT simply owed no duty to Johnson, who was a stranger to it.

As we have noted, in Johnson's complaint, he identified two purported duties he believed were owed to him and breached by Systems XT: (1) a duty to ensure the sensor was properly hooked up by Power Edge Solutions and not generating false alarms; and (2) a duty to ensure Brownco put its ladders away at the end of each day. In his opposition to Systems XT's motion for summary judgment, he again identified each of these duties, and alleged that they were owed him based on general principles of foreseeability, as well as the terms of Systems XT's contract with Raytheon. In addition, Johnson added to his opposition a new duty not previously alleged: (3) a duty to provide temporary lighting at the worksite.

On the issue of lighting, there was evidence that Johnson had a flashlight with him. There was some evidence that Raytheon had told Systems XT to install temporary lighting, which had been placed on the roof of the E5 building and shone downward into the water cooling tower construction area while work was being done outside of daylight hours. There was also evidence that the lights were still on the roof at the time of the accident, but had been disconnected.

10

The trial court granted Systems XT's motion for summary judgment.

**6.      Judgment and Appeal**

Judgments were entered in favor of Raytheon and Systems XT.  Johnson filed timely notices of appeal.

DISCUSSION

**1.      Standard of Review**

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action."  (Code Civ. Proc., § 437c, subd. (p)(2).)  Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (*Id.*, subd. (c).)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' "  (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 848.)  It is no longer called a "disfavored" remedy.  (*Perry,* at p. 542.)  "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case."  (*Ibid.*)  On appeal, "we take the facts from the record that was before the trial court. . . .  ' "We review the trial court's decision de novo,[9] considering all the evidence set forth

---

[9]      In his opening brief, Johnson states that he is only addressing the theories on which trial court based its summary judgment ruling, not all of the theories on which Raytheon and Systems XT sought summary judgment.  As our review is de

in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037, citation omitted.)

**2. Raytheon Was Appropriately Granted Summary Judgment**

**a. Brief overview of *Privette* and its progeny**

To understand *Privette*, one must begin with the general principle that, historically, a hirer of an independent contractor was not liable for the negligence of the independent contractor. (*Privette, supra,* 5 Cal.4th at p. 693.) Many exceptions were adopted to that rule, including the "peculiar risk" doctrine, which ensured "that innocent third parties injured by the negligence of an independent contractor hired by a landowner to do inherently dangerous work on the land would not have to depend on the contractor's solvency in order to receive compensation for the injuries." (*Id.* at p. 694.) In *Privette*, our Supreme Court considered whether to extend the peculiar risk doctrine to the situation where the injured party was an employee of the independent contractor. The court answered the question in the negative, largely, although not exclusively, on the basis that the injured employee would already receive benefits from the workers' compensation system. (*Id.* at pp. 692, 699.) The court concluded that the policy reasons for allowing a third party to recover against the hirer of a negligent independent contractor under the doctrine of peculiar risk were simply not present when the injured plaintiff was an employee covered by workers' compensation. (*Id.* at p. 701.)

---

novo, we may affirm for reasons different from the trial court's reasons. (*Bunnell v. Department of Corrections* (1998) 64 Cal.App.4th 1360, 1367.)

12

After *Privette* came a series of cases extending it. *Privette* renders the hirer of an independent contractor immune from liability to the independent contractor's employee even when the basis for liability was that the hirer failed to provide in the contract that the contractor must take special precautions to avert the risks of the work. (*Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 256-257.) *Privette* also bars liability when the injured employee's theory is that the hirer negligently hired the independent contractor. (*Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1238.) Finally, *Privette* applies when the injured employee's cause of action against the hirer of the independent contractor is based on the hirer's failure to comply with statutory or regulatory workplace safety requirements. (*SeaBright Insurance Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 594.)

There are, however, two circumstances in which *Privette* does not apply, and an injured employee of an independent contractor may recover in tort from the party which hired that independent contractor. The first, which we have already alluded to, was set forth in *Hooker*, and was based on the concept of negligent exercise of retained control. "[A] hirer of an independent contractor is not liable to an employee of the contractor merely because the hirer retained control over safety conditions at a worksite, but . . . a hirer is liable to an employee of a contractor insofar as a hirer's exercise of retained control *affirmatively contributed* to the employee's injuries." (*Hooker, supra,* 27 Cal.4th at p. 202.)

The second *Privette* exception was discussed in *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 (*Kinsman*), and sets forth the limited circumstances in which the hirer of an independent

13

contractor can be liable to an employee of that contractor for hazardous conditions of its property. "[A] landowner that hires an independent contractor may be liable to the contractor's employee if the following conditions are present: the landowner knew, or should have known, of a latent or concealed preexisting hazardous condition on its property, the contractor did not know and could not have reasonably discovered this hazardous condition, and the landowner failed to warn the contractor about this condition." (*Kinsman,* at p. 664, fn. omitted.)

In this case, Raytheon obtained summary judgment on the basis of *Privette*. We agree that the undisputed facts establish the initial applicability of *Privette* and its progeny: Raytheon hired ABM as an independent contractor; Johnson is an ABM employee seeking to pursue Raytheon for injuries he suffered in the course of his employment and for which he obtained workers' compensation. That Johnson was injured allegedly due to the negligence of another independent contractor also retained by Raytheon does not prevent *Privette*'s application to Raytheon. (*Smith v. ACandS, Inc.* (1994) 31 Cal.App.4th 77, 94.) The issues raised by this appeal concern whether Johnson has established a triable issue of material fact exists as to one of the two exceptions, either retained control under *Hooker* or premises liability under *Kinsman.*

### b. No triable issue of fact under *Hooker*

There are three elements to the *Hooker* exception: (1) the hirer retains control over any part of the work; (2) the hirer negligently exercises that control; and (3) the hirer does so in a manner that affirmatively contributes to the employee's injury. (*Khosh v. Staples Construction Co., Inc.* (2016) 4 Cal.App.5th 712, 717.)

14

There is no evidence that Raytheon placed the Brownco partial extension ladder at the cooling tower wall, and Johnson did not oppose summary judgment on the basis that Raytheon affirmatively contributed to his fall by *replacing* the platform ladder with the Brownco partial extension ladder. Instead, he argued that Raytheon affirmatively contributed to his injury by *omitting* to have its usual platform ladder present at the wall. "[A]ffirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker, supra,* 27 Cal.4th at p. 212, fn. 3.)

We assume, without deciding, that Johnson has raised a triable issue of fact that the usual presence of a platform ladder at the cooling tower wall constituted an affirmative promise to provide one. Nonetheless, Johnson has failed to raise a triable issue of fact that Raytheon's failure to ensure the presence of a platform ladder on the night of the accident affirmatively contributed to his fall. This is so because of the undisputed evidence that Raytheon provided ABM employees with access to numerous other safe ladders. Johnson himself testified that ladders were in the chiller room of the very same building in which he worked, and that he could have gone to the water cooling tower via a route which took him right through the room where the ladders were stored.

In this respect, this case is to be distinguished from *Browne v. Turner Construction Co.* (2005) 127 Cal.App.4th 1334. In *Browne*, the plaintiff was a subcontractor's employee who fell

15

from a ladder while working at a high height. He brought suit against both the general contractor and the owner, claiming they were liable under *Hooker* for removing safety devices they had previously provided. Specifically, the defendants had provided a system of safety lines to which employees working at heights were able to anchor themselves. The defendants had also provided scissor lifts, which enabled the employees to perform elevated work without ladders. The defendants removed the safety lines some months prior to the accident, and abruptly removed the scissor lifts immediately before the plaintiff's accident. (*Browne,* at pp. 1337-1339.) The trial court granted the defendants summary judgment on *Hooker*, but the Court of Appeal reversed. The court held that the defendants' removal of these two safety devices left the plaintiff "with no safe means of completing the work. There was no evidence that this was done in the expectation that plaintiff's employer could, would, or should make substitute arrangements." (*Browne,* at p. 1345.) The court noted that the removal of the safety lines had occurred two months prior, and this itself might not have constituted negligence so long as the scissor lifts were present. "There is evidence, however, that defendants abruptly removed the lifts the day before the injuries, that they wanted the work finished without delay, and that they might not have permitted a lift to be brought back into the [room where the plaintiff was working] even if one had been obtained." (*Ibid.*)

In short, in *Browne*, summary judgment was reversed because there was evidence the defendant abruptly removed the only remaining safe way for the plaintiff to do his job, demanding the work be finished without delay and possibly even preventing the plaintiff from bringing the safety equipment back. In

16

contrast, in this case, Johnson can only establish that someone removed the platform ladder from the wall, but there were numerous other A-frame ladders freely available nearby. While Johnson suggests the alarm could have reflected a critical cooling tower failure which could result in substantial financial loss to Raytheon, there is no evidence that Raytheon demanded Johnson investigate the alarm with such expediency that he could not stop in the chiller room and obtain an A-frame ladder to do the job safely. (Cf. *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120, 1132-1133 [reversing summary judgment because the governing contract prohibited the plaintiff's employer from taking the necessary safety precaution without the advanced written permission of the defendants].)

In his opening brief on appeal, Johnson argues that the removal of the platform ladder created "a situation where [Johnson] was left with no safe means of performing his work." After Raytheon pointed out the availability of other ladders in its respondent's brief, Johnson argued, in reply, that he had believed the ladder he found at the wall had been left by Raytheon, so had assumed it was safe, and that the area was not sufficiently well lit for him to have appreciated the danger posed by the partial extension ladder. While these arguments go some way to explaining why Johnson chose to use the partial extension ladder he discovered at the wall, they do not raise a triable issue of fact as to Raytheon's alleged affirmative contribution to his injury. Raytheon did not represent that the partial extension ladder was a safe replacement for the platform ladder, nor did Raytheon promise to provide ABM's employees with light fixtures at the water cooling tower – and Johnson cannot suggest for the first time in its reply brief on appeal that it did.

17

### c. No triable issue of fact under *Kinsman*

In the alternative to his argument that Raytheon is liable under the *Hooker* exception to *Privette*, Johnson argues that Raytheon is liable in premises liability. But Johnson largely overlooks the fact that, when *Privette* would otherwise apply, the *Kinsman* test determines when the hirer is, and is not, liable for premises liability to the employee of its independent contractor. (*Madden v. Summit View, Inc.* (2008) 165 Cal.App.4th 1267, 1278.)

Under *Kinsman*, the hiring defendant is liable only if: (1) it knew, or should have known, of a latent or concealed preexisting hazardous condition on its property; (2) the independent contractor did not know and could not reasonably have discovered the hazardous condition; and (3) the landowner failed to warn the contractor about the condition. (*Kinsman, supra,* 37 Cal.4th at p. 675.) Even the most cursory review of the facts in this case establishes that Johnson cannot satisfy this test. Assuming, without deciding, that the presence of Brownco's partial extension ladder against the cooling tower wall constituted a hazardous condition of Raytheon's property, Johnson has failed to raise a triable issue of material fact of the first element: that Raytheon knew or should have known that it was there. At most, Johnson relies on evidence that Raytheon's manager of central plant operations had seen Brownco employees using this partial extension ladder at the water cooling tower wall one week prior to the accident. But this is not evidence that Raytheon was aware that the partial extension ladder had been left at the wall at the time of the accident. Moreover, Johnson cannot establish that ABM could not reasonably have discovered the hazardous condition. The partial extension ladder was clearly marked with

18

the "caution" sticker, identifying it as a partial extension ladder not to be used without the other part.[10]  Although it was dark, defendant had a flashlight.  If he had inspected the ladder, he would have discovered the danger it presented.

The *Kinsman* opinion noted, however, that there may be situations "in which an obvious hazard, for which no warning is necessary, nonetheless gives rise to a duty on a landowner's part to remedy the hazard because knowledge of the hazard is inadequate to prevent injury." (*Kinsman, supra*, 37 Cal.4th at p. 673.)  This is so when, for example, the practical necessity of encountering the danger, when weighed against the apparent risk involved, is such that, under the circumstances, a person might choose to encounter the danger.  (*Ibid.*)  This gloss on the rule also does not assist Johnson.  As we have discussed above in connection with the *Hooker* exception, it is undisputed that there were A-frame ladders available to Johnson.  Thus, if the Brownco partial extension ladder were to be considered an obvious hazard, it cannot give rise to Raytheon's liability because knowledge of the hazard is *not* inadequate to prevent injury.  Anyone with actual knowledge of the hazard could have avoided it by obtaining an A-frame ladder instead.

In this regard, Johnson argues that his own failure to use due care would be relevant only to comparative negligence, and

---

[10]     In his reply brief, Johnson argues that there was nothing on the "caution" label "to notify [Johnson] that the ladder posed a safety hazard such that it would cause him to fall or inflict serious bodily injury if used."  On the contrary, the caution label states, "CAUTION.  THIS LADDER SECTION IS NOT DESIGNED FOR SEPARATE USE."  To the extent Johnson suggests that the label must specifically warn of serious bodily injury, we disagree.

would not absolve Raytheon from liability, citing *Castro v. City of Thousand Oaks* (2015) 239 Cal.App.4th 1451, 1458-1459. But *Castro* was a case involving the dangerous condition of public property, not a *Privette/Kinsman* case. Here, the initial formulation of the *Kinsman* test asks whether the independent contractor could reasonably have discovered the latent hazardous condition; the gloss on the test for obvious hazards asks whether knowledge of the hazard is inadequate to prevent injury. Both of these tests are defeated where, as here, there is undisputed evidence that the hazard could reasonably have been discovered (by inspecting the ladder) and, once discovered, avoided (by getting another ladder). (*Gonzalez v. Mathis* (2018) 20 Cal.App.5th 257, 273-274 review granted May 16, 2018, S247677 [in premises liability, the reasonableness of a party's actions is a question of fact unless reasonable minds can come to only one conclusion].)

3.   **Systems XT Was Appropriately Granted Summary Judgment**

In Johnson's appeal of the summary judgment in favor of Systems XT, he argues both that Systems XT is not entitled to the benefit of *Privette* and that Systems XT is otherwise liable to him in negligence, for breach of a duty of care. We need not reach the first issue, because we conclude Johnson is wrong on the second. Systems XT owed him no duty.

" 'Actionable negligence is traditionally regarded as involving the following: (1) a legal duty to use due care; (2) a breach of that duty; and (3) the breach as the proximate or legal cause of the resulting injury.' [Citation.] ' " "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys

20

legal protection against unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court.' " ' " (*Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 437 (*Suarez*).)

Johnson argues that there were three duties owed: (1) a duty to ensure Power Edge Solutions properly installed the sensor and it was not generating false alarms; (2) a duty to ensure Brownco put its ladders away at the end of each day; and (3) a duty to provide temporary lighting at the worksite. Johnson argues each of these duties is owed under general tort principles (see *Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113 (*Rowland*)) and due to the contract between Systems XT and Raytheon.

Momentarily setting to one side the duty to provide temporary lighting (which Johnson did not allege in the operative complaint), the duties on which Johnson relies are, in effect, an attempt to hold Systems XT vicariously liable for the acts and omissions of its independent contractors. But Johnson makes no argument that Systems XT should be liable for the acts of its subcontractors under the peculiar risk doctrine or any other exception to the general rule of nonliability for the negligence of one's independent contractors. Instead, he simply argues that a duty is owed because it was foreseeable that, as an employee of another contractor on the same jobsite, he might be injured by responding to a false alarm and/or using a partial extension ladder left on the premises. Additionally, he finds a duty for Systems XT to take responsibility for its subcontractors in the contract between Systems XT and Raytheon.

Johnson's foreseeability argument has its roots in *Rowland.* Johnson suggests that the *Rowland* factors, of which there are seven (see *Rowland, supra,* 69 Cal.2d at p. 113) favor the existence of a duty imposed on Systems XT in this case, but he addresses only the first factor, foreseeability. We assume Johnson concedes that the remaining factors (the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the burden to the defendant and consequences to the community of imposing a duty, and the availability of insurance) weigh against a finding of duty. (See *Suarez, supra,* 180 Cal.App.4th at p. 438 [at common law, the law did not recognize a "special relationship between an employer, such as [the defendant] and the employees of another employer who are present at the same worksite"].)

Johnson next would find a duty in the contract between Raytheon and Systems XT. To be sure, the common law did recognize "that a special relationship of the type that gives rise to a duty to take affirmative action to protect another may be created by contract . . . ." (*Suarez, supra,* 180 Cal.App.4th at p. 438.) We therefore consider whether the Raytheon/Systems XT contract imposed on Systems XT a duty *to Johnson* with respect to Systems XT's control over its subcontractors.

The first duty Johnson would impose is a duty to ensure Power Edge Solutions installed the monitor correctly such that it generated no false alarms. For this, Johnson relies on an August 9, 2011 "Statement of Work" for the water cooling tower project, which provides that the water cooling plant "must be a 24 x 7 'Fail-Safe' operation" because it "supports the Critical

22

Labs, Clean Rooms and Computer Centers" throughout Raytheon's campus. We have no doubt that Raytheon hired Systems XT to install a "24 x 7 'Fail-Safe' operation," as this was necessary for Raytheon's purpose, as the document itself explains. But Johnson has identified no contractual term which provided that Systems XT's contractual duty to deliver to Raytheon a fail-safe operation created a duty to maintenance engineers who may be working on Raytheon's premises to provide a system which never generated a false alarm in need of investigation. For example, there is no suggestion that Raytheon had previously promised ABM there would be no false alarms and that it contracted with Systems XT to assume its contractual duty. Johnson is simply not a third party beneficiary of this contract (Civ. Code, § 1559) and the agreement therefore does not give rise to a duty owed to him.

The second duty Johnson would impose is a duty on Systems XT to ensure that Brownco put its ladders away at the end of each day. Here, Johnson relies on multiple provisions of Raytheon's "Contractor Safety Handbook [for] Outside Contractors." These include that general contractors "assume[] responsibility to ensure that subcontractors adhere to . . . the requirements described in this handbook. The general contractor will be held responsible for any violations committed by any of their sub-contractors." The specific provision on "Housekeeping" provides that "Contractors are responsible for keeping their work areas orderly and neat. If their work areas pose tripping or slipping hazards to Raytheon employees, proper warning signs must be posted. At the close of each workday, contractors must clean and free the work area of all trash, debris, tools, equipment, dust, extension cords, and/or similar hazards." The provision

governing ladders provides, "When not in use, store the ladder in an appropriate storage space." Johnson also relies on Raytheon's general construction terms and conditions, which were incorporated by reference into the Raytheon/Systems XT contract. These provisions include: "All tools, equipment, supplies and other items required for the construction project must be secured by the contractor/subcontractor." (Capitalization omitted.) The general terms also include a provision on "Safety Requirements," which states, "Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work, including work by any subcontractors. Contractor shall take all reasonable precautions for the safety and health of, and shall provide all reasonable protection to prevent damage, injury or loss to: [¶] (1) all employees on the project, whether their own or belonging to a subcontractor, and all other persons who may be affected or injured as a result of the work contemplated under this contract . . . ." Johnson argues that as he is an "other person[]" who was injured as a result of Systems XT's subcontractor's failure to comply with the requirement to put its ladders away at the end of the day, Systems XT assumed a duty to Johnson by this language.

The law is not so broad. In *West v. Guy F. Atkinson Constr. Co.* (1967) 251 Cal.App.2d 296, a pre-*Privette* case, a subcontractor's employee was injured at a job site and brought suit against the general contractor on the job. As in our case, liability turned on whether the general contractor had assumed a duty of care toward the plaintiff. (*Id.* at pp. 297, 299.) The plaintiff relied on the contract between the general contractor and the hirer, by which the contractor agreed that he would

24

" 'provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility . . . reasonably necessary to protect the life and health of employees on the job and the safety of the public . . . .' " (*Id.* at p. 302.) Standard provisions incorporated into the contract also provided that the contractor would keep the work under his control, and all subcontractors would be recognized as employees of the contractor. (*Ibid.*) When the injured subcontractor's employee sought to impose liability on the contractor based on these provisions, the Court of Appeal disagreed. The court read the contract as simply emphasizing the fact that by subcontracting, the contractor was not relieved of any obligation otherwise already owed. The hirer "did not intend by said provisions to enlarge [the contractor's] liability or create a third-party-beneficiary contract [citation] to the end that the subcontractor's employees would enjoy the right to a common law action at law in addition to their right to workmen's compensation benefits." (*Ibid.*) Likewise, the provisions on which Johnson relies simply provide that Systems XT is not absolved of its existing responsibilities by the use of subcontractors. There is no evidence that Raytheon intended to create a third party beneficiary contract by which individuals, like Johnson, to whom Systems XT did not otherwise owe a duty, would be entitled to recover in tort.

Finally, we return to the one duty which Johnson suggests Systems XT breached with its own conduct, not simply vicariously: Johnson argues that Systems XT owed him a duty to keep the area lit. Nowhere in the operative complaint did Johnson allege that Systems XT owed him any such duty. A plaintiff may not oppose summary judgment by raising a theory

25

not pleaded. Here, that is exactly what Johnson sought to do. Systems XT pointed out in its reply in the trial court that it was too late for Johnson to submit this new theory.

"To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.] If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264-1265; see *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 421 ["A moving party seeking summary judgment or adjudication is not required to go beyond the allegations of the pleading, with respect to new theories that could have been pled, but for which no motion to amend or supplement the pleading was brought, prior to the hearing on the dispositive motion."]; see also Edmon & Karnow, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2018) § 10:51.1, p. 10-22; § 10:257, p. 10-118.)

Here, Johnson never sought to amend the operative complaint with his new factual assertion that Systems XT owed him any duty to provide lighting. No evidence supports any such duty, in any event. Johnson relies on a provision of the contract between Raytheon and Systems XT which pertains to the work as finished, not any temporary lighting to be provided while work is in progress. Moreover, as discussed above, there is no indication that Systems XT's contract with Raytheon was intended to benefit Johnson. Johnson's *Hooker*-type argument, suggesting that Systems XT voluntarily undertook the duty to provide temporary lighting as a safety measure, but abruptly removed that lighting just prior to his fall, also has no evidentiary support.

26

Systems XT did not leave Johnson in the dark with no way to perform his task. Johnson had a flashlight; he simply chose not to use it when he inspected the water level.

## DISPOSITION

The judgments in favor of Raytheon and Systems XT are affirmed. Raytheon and Systems XT shall recover their costs on appeal.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.

WILEY, J.

Filed 3/27/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LAURENCE JOHNSON,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>RAYTHEON COMPANY et al.,<br><br>  Defendants and Respondents. | B281411<br><br>(Los Angeles County<br> Super. Ct. No. BC562444)<br><br>**ORDER CERTIFYING<br>OPINION FOR<br>PUBLICATION**<br><br>[No change in judgment] |

THE COURT:

The opinion in the above-entitled matter filed on March 8, 2019, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____

GRIMES, Acting P. J.        STRATTON, J.        WILEY, J.