Filed 9/20/23 Certified for Publication 10/19/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOUIS ACOSTA, | B316420 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC717512) |
| v. | |
| MAS REALTY, LLC, et al., | |
| Defendants and Appellants; | |
| HORIZON LIGHTING, INC., | |
| Cross-defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney, Judge.  Reversed with directions.

Law Offices of Cleidin Z. Atanous, Cleidin Z. Atanous; The Safarian Firm, Harry A. Safarian, and Christina S. Karayan for Defendants and Appellants.

Kramer Trial Lawyers, Daniel K. Kramer, Teresa A. Johnson; Esner, Chang & Boyer, Stuart Esner, Andrew N. Chang, and Kevin K. Nguyen for Plaintiff and Respondent.

Horvitz & Levy, H. Thomas Watson, Jason R. Litt; Bremer Whyte Brown & O'Meara and Daniel A. Crespo for Cross-defendant and Respondent.

———————————————

Plaintiff Louis Acosta, an electrical technician, was injured when a broken hatch providing access to the roof of a commercial building slammed shut on his back, herniating several of his discs. He sued the building's owner and management company for negligence and premises liability, contending that defendants had failed either to repair a dangerous condition of which they were aware or to warn him of it. A jury returned a special verdict for Acosta and awarded him damages in excess of $12.6 million.

We reverse. As we discuss, under *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*) and its progeny, a property owner who hires an independent contractor may be liable to the contractor's employee for injuries sustained on the job only if the owner exercises retained control over any part of the contractor's work in a manner that affirmatively contributes to the worker's injuries, or the employee is injured by a concealed hazard that is unknown and not reasonably ascertainable by the contractor. In the present case, Acosta does not contend that defendants exercised any retained control over the work site, and the

2

undisputed evidence established that Acosta and his employer could reasonably have ascertained the hazardous condition of the site—i.e., that the mechanism designed to hold the roof hatch open was broken and the ladder that provided access to the hatch did not reach all the way to the roof. Accordingly, we will direct entry of judgment for defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Background.

Defendant MAS Realty, LLC (MAS) owns a shopping center called Arlington Plaza. Arlington Plaza is made up of one large building and three smaller buildings, each of which is identified by a letter. The building at issue in this case is referred to as "Building A," "Sector A," or "Pad A."

In 2014, MAS hired defendant Athena Property Management, Inc. (Athena) to manage Arlington Plaza. The same year, Athena hired a roofing company, The Roof Depot, Inc. (Roof Depot), to inspect Arlington Plaza's roofs and make any necessary repairs. In September 2014, Roof Depot advised Athena of two issues with the Building A roof access. First, the roof access cover (also referred to as a "hatch" or "roof hatch") " 'does not close properly. Spring is broken making it heavy and dangerous to open and close.' " Second, the " '[r]oof ladder is too short. Roof ladder stops two feet from the top of the roof hatch. Does not meet OSHA specifications.' " Roof Depot advised that the cost to repair these issues was $3,353. It is undisputed that these repairs were not made.

### II. The August 10, 2016 incident.

Acosta is an electrical technician. In 2015, he began working for Horizon Lighting, Inc. (Horizon), which had

3

contracted with Athena to maintain the lights in Arlington Plaza's common areas, including the exterior and parking lot lights.

On August 10, 2016, Arlington Plaza was the first stop on Acosta's maintenance route. Acosta noticed that the exterior lights of Building A were still on, which he attributed to an incorrectly set time clock or a malfunctioning photocell. A security guard let Acosta into Building A's locked electrical room. Acosta attempted to switch on the room's interior light but it did not come on. There nonetheless was enough light in the room for Acosta to "distinguish what was on the electrical panel" and to "get around." When Acosta did not find a time clock or circuit breaker in the room, he decided to go onto the roof to inspect the rooftop photocells.

Acosta saw a fixed ladder leading to the roof access, and after tugging on it to be sure that it was firmly attached, he began climbing the ladder. As he got near the top, he held onto the top rung of the ladder with one hand and unlatched the hatch with his other hand. After doing so, he realized that the ladder did not reach all the way to the roof. He climbed one more step, fully opened the hatch, and locked it into place. Acosta then climbed to the top of the ladder, grabbed the frame of the hatch, and swung one leg over the frame. As he pulled his other leg over the frame, the hatch released and fell on him, pinning him between the hatch and the frame. He felt a numbing sensation on the right side of his body and almost fell to the ground. He was able to maintain his grip, pushed the door back open, and pulled himself onto the rooftop.

Acosta reported the accident to his supervisor, who asked him to take photographs and try to determine why the hatch had

fallen on him. From the roof, Acosta opened the hatch with one hand and unlatched the locking mechanism with his other hand. As he did so, the hatch fell shut. Because there was no resistance preventing the hatch from closing, Acosta believed that the spring designed to hold the hatch open was either " broken or missing or wrong type of spring." Acosta took pictures of the area, climbed off the roof, closed the hatch, and climbed down the ladder. As he descended, he noticed a handwritten note on the wall that said, "HATCH BROKEN! WATCH FINGERS AND HEAD ☹." Acosta wished he had seen the handwritten warning prior to ascending the ladder.

The day after the accident, Acosta prepared a written statement for his employer describing the accident's cause. His statement said as follows: "On August 10, 2016, I arrived at Arlington Plaza in Riverside at 6:20 a.m. I performed a survey and had made several repairs throughout the property. I noticed a set of lights that were still on and needed to replace a bad photocell on the rooftop. At around 7:55 a.m. security had unlocked the roof access and I began to go up the ladder. I opened the roof hatch and noticed that the spring assist was broken. I latched the bar that holds the hatch open and proceeded to climb the last few steps of the ladder. The ladder didn't go all the way to the top like all other access ladders do, this one was about 3 feet shorter. I needed to get on the last step and throw my leg over [the] top of the hatch to get on the roof. While doing this, one of the pockets of my tool belt had caught the latch and caused the hatch to close and land on my back. My body was partially out and the metal tab that is used for a padlock had struck the right shoulder blade area and the rest of

5

the door had hit the upper middle back area.  [¶]  I put the hatch back up and secured it, then got on the rooftop."

Although Acosta was able to continue working immediately after the accident, he felt worse as the day progressed and sought medical care.  Eventually, Acosta was diagnosed with ruptured discs in his cervical and lumbar spine.  He experienced pain, numbness, and weakness in his neck, back, shoulders, and legs, and ultimately underwent two spinal surgeries.  Acosta continues to experience chronic pain and has been unable to work regularly since the accident.

## III.   The present action.

In August 2018, Acosta filed the present action against MAS and Athena (collectively, defendants) for negligence and premises liability.  Defendants cross-claimed against Acosta's employer, Horizon, for contractual indemnity and declaratory relief.[1]

## IV.   The cause of the accident and Acosta's awareness of the broken hatch.

### A.   The accident's cause.

Acosta's retained safety engineering expert, Brad Avrit, testified that the accident occurred because the compression cylinder designed to keep the roof hatch open was broken.  Avrit explained that a compression cylinder contains a spring that is compressed when the hatch is closed.  Once released, the spring helps to push the hatch open and then holds the hatch in the

---

[1]     Horizon has represented that the trial on the cross-complaint was to begin after the completion of the personal injury trial; it remains pending before the superior court.

6

open position until it is actively pulled shut. The purpose of the compression cylinder is to assist in opening the approximately 100-pound hatch and to keep it from falling shut when the locking mechanism is released. Had the compression cylinder worked as intended, the hatch would have immediately opened six to 12 inches once it was unlocked and would have remained open until it was actively pulled shut. In this case, however, the cylinder was present, but the spring was missing. As a result, when the locking mechanism was touched, "the roof hatch just free falls down and closes."

Avrit testified that a secondary cause of the accident was that the top rung of the fixed ladder in the electrical room was about 30 inches below the roof hatch. This violated OSHA regulations, which require a fixed ladder to extend all the way to the roof. Avrit opined that the short ladder contributed to the accident because Acosta could not step from the top rung onto the roof, but had to lift his leg up and over the hatch, increasing the probability of coming into contact with the locking mechanism.

In Avrit's opinion, the hatch was "absolutely not safe" because "if the hold-open arm is just touched, . . . just a minimal amount of pressure, that thing can come slamming down. . . . And it's—it's unnecessarily not safe. All you need to do is install those spring hinges and the lid will stay up. And it won't be until you pull on it that it will come down, and only come down as hard as you pull on it."

## B. Acosta's awareness of the broken hatch.

Acosta testified that he used roof hatches frequently, typically several times a month, or about 650 times over the course of his 13-year career. He considered himself an expert on

the operation and functionality of roof hatches "to a certain extent." He had never before encountered a broken roof hatch.

As noted above, in his written statement regarding the accident, Acosta said that he noticed the spring assist was broken as soon as he opened the roof hatch. When questioned at his deposition about this statement, Acosta initially testified that he knew the spring assist was broken before he climbed through the hatch. He said: " 'When I had opened up the door, typically what the spring assist is it has pressure to where opening up the door would be assisted with the spring, so the entire weight of the door is—is—wouldn't be—how can I say this. The whole weight of the door would be assisted in—in opening up by the spring so it would—it would alleviate some of the weight off of the person opening up the door. It's kind of like a—just make[s] it easier to open up.' "

After taking a break and conferring with his counsel, Acosta clarified his deposition testimony as follows: " 'When I stated I opened up the roof hatch and noticed that the spring was broken, so at the time of the incident I only noticed that the roof hatch was heavier than expected. At the time I didn't realize it was broken. The reason why I wrote it in this report is I just put two and two together and figured out that [was] the reason why it fell on me. At the moment of my exit or opening that door, I just remember it was a little heavier than expected, but not being able to see physically inside of the cylinder if the spring was broken or not, I wasn't able to really know that it was broken until it actually fell on me.' "

In his direct testimony at trial, Acosta testified that before the hatch fell on him, he did not "know for a fact" that the spring

8

was broken or missing.  He also did not realize until after the accident that the ladder was too short.

During cross-examination, defense counsel questioned Acosta at length about the discrepancies between his initial and subsequent deposition testimony and whether Acosta was aware of the broken cylinder prior to the accident.  The relevant colloquy was as follows:

"Q:    [W]e've discussed how the spring assist mechanism is there so that the lid or the hatch opens up by itself a number of inches once it's unlocked, correct?

"A:    Yes.

"Q:    And that day once you unlocked it[,] it did not go up by itself; is that correct?

"A:    That is correct.

"Q:    Having been through 650 hatches, you know that is not normal behavior for a properly functioning hatch, correct?

"A:    I've ran across a couple of hatches that were the same way. . . .

"Q:    And you know when you run across one that doesn't do that it's not working properly, correct?

"A:    It could be just some of the simple wear and tear also.

"Q:    Okay.  But you know it's not normally functioning how it should, correct?

"A:    You could say that.

"Q:    Okay.  So before you go through the hatch, you know it's not functioning how it should, correct?

"A:    Initially I just felt—like I said before, it just felt a little bit heavier than usual.  That's the only thing that I was thinking.

"Q: I understand that. But that's not how it should be functioning based upon your 650 experiences approximately going through roof hatches, correct?

"A: Yeah, you could say that.

"Q: Okay. So as you're going through the hatch you know it's not working correctly, yes or no?

"A: Yes. . . .

"Q: Okay, now when you have a spring assisted hatch, it's effortless and all 60 pounds, assuming it weighed 60, would open up by itself, correct?

"A: Typically, yes.

"Q: You used your left side, your nondominant side, that day to open the hatch, correct?

"A: That is correct.

"Q: You pushed up with your nondominant side, 60 pounds of force, to open the hatch, correct?

"A: That is correct.

"Q: So you could easily tell the difference between an automatically opening door versus a 60-pound weight that you're pushing, correct?

"A: Yes. [¶] . . . [¶]

"Q: . . . [I]f you're pushing 60 pounds or so unassisted without any spring mechanism versus something opening up by itself, that is obvious to anyone, especially a trained expert like you, correct?

"A: Yes."

Acosta also acknowledged that he was aware the ladder did not reach all the way to the hatch's edge before he climbed through the roof access.

With regard to the handwritten warning on the wall of the electrical room, Acosta testified that the room was sufficiently well lit to see the warning, but he did not see it before climbing through the roof hatch because he was looking up. He agreed that he had been trained to inspect every rung before climbing a ladder, and that had he done so, he would have seen the handwritten warning. However, he said workers in his industry did not typically check every rung on a ladder, especially if the ladder was stored indoors where it would not be exposed to sun damage.

Plaintiff's expert, Avrit, testified that had the compression cylinder worked as intended, the hatch would have sprung open once it was unlocked and would have remained open even after the hatch's locking mechanism was released. He said that to someone knowledgeable about roof hatches, once the hatch was unlocked and did not lift several inches, it would be "plainly obvious . . . that the spring assist is not doing what it's supposed to do" and was "not in good condition." Avrit nonetheless opined that Acosta had acted reasonably in accessing the roof through the hatch: "He climbed up the ladder, he was asked to go up to the roof to check on some lighting fixtures. He went up—the only designated way to get up to the roof is through this ladder. He got up to the top, he opened the hatch, he locked the arm, and then did his best to try and crawl out. I didn't see that he did anything that was out of the ordinary or unreasonable." Avrit further testified that the handwritten warning was not adequate to put Acosta on notice of the broken hatch because it did not comply with OSHA, "looks like graffiti," and "doesn't stand out from anything else that was written on the wall." He agreed,

11

however, that Acosta should inspect a ladder before using it and should "have good visual contact with each rung" while climbing.

Defendants' safety expert, Gidon Vardi, testified that if the spring assist had been functioning properly, it would "literally create[ ] a nonresistant action, meaning it will spring up . . . by itself." If a spring assist were broken, a knowledgeable person would be aware of the problem "almost instantaneously. It would be immediate." In the present case, Vardi said that when he inspected the hatch, he could tell that the spring assist was not completely operational even before he opened the hatch because "[t]here was a missing spring that you could see that's missing." It was also obvious that the ladder was short. And, Vardi opined that while the handwritten warning was "not perfect," it was clearly visible—"literally in your face"—and was typical of warnings often present on construction sites.

Vardi opined that when entering a job site, a worker is "required, absolutely required to make [a] safety assessment of the site. They have to make sure that the site is absolutely safe for them to conduct their duties." For an electrical technician like Acosta, that includes making sure there is no active electrical charge, and if it is necessary to ascend a ladder, "you have to actually check every single rung, making sure you actually physically make sure the ladder [is] attached and it's secure. And then you have to make sure that it goes all the way up to the top so you can climb onto the roof properly without any hazards. And then of course you would have to look at the hatch itself."

## V. Trial and verdict.

### A. Motion for nonsuit.

Defendants moved for a nonsuit at the conclusion of plaintiff's case. Defense counsel argued that under *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 (*Kinsman*), "[i]f the plaintiff knows or could reasonably have known there was a defect with the hatch, then the plaintiff assumes the risk[.] [I]t is the plaintiff's or his employer's burden to inspect and eliminate the risk. If the plaintiff encounters it knowing or should know that there's an issue, his claims are barred. The plaintiff just acknowledged on the stand . . . [that] he knew the hatch was not functioning properly." Further, counsel said, "[t]he plaintiff doesn't need to know specifically what the defect is. He just needs to know that there was a problem with the roof hatch. We don't need him to diagnose it. Once he realizes there's a problem with the hatch, then it's over under *Kinsman* and plaintiff cannot proceed any further."

Acosta's counsel disagreed, arguing that "counsel simply misreads *Kinsman*. *Kinsman* is very clear that the knowledge of the concealed condition has to be known by the contractor itself, not the contractor's employee. . . . It has to be that Horizon in this case was aware the door was dangerous or that they were properly warned of it. There's . . . zero evidence of that here."

The trial court denied the motion. It said: "What we've got is a situation where we have Mr. Acosta testifying, yes, he was having difficulty opening the latch. Does that equal an open and obvious condition? I don't think I can make that leap. All we know is he's having difficulty opening it. That's not the same as an open and obvious condition. So I think that's a jury call."

13

## B.    Motion for a directed verdict.

At the close of trial, defendants moved for a directed verdict. Defense counsel again urged the court that there were no factual issues for the jury to decide because Acosta conceded that he was aware of the unsafe condition of the hatch. The court denied the motion, explaining: "I still think it's a factual issue for the jury to determine whether or not . . . Mr. Acosta appreciated the severity of the dangerous condition. He was aware . . . that the latch was difficult to raise. How dangerous was that, I don't know. That's for the jury to decide whether he reasonably should have known."

## C.    Jury verdict.

The trial court adopted Acosta's proposed special verdict form, which was based on CACI No. 1009A. The jury returned a special verdict for Acosta as follows:

1.     Did Athena know or reasonably should have known about a preexisting unsafe concealed condition on the property? Yes.

Did MAS know or reasonably should have known about a preexisting unsafe concealed condition on the property? Yes.

2.     Did Horizon not know or could not have reasonably known about the unsafe concealed condition? Yes.

3.     Was the condition part of the work Horizon was hired to perform? No.

4.     Did Athena fail to warn Horizon about the condition? Yes.

Did MAS fail to warn Horizon about the condition? Yes.

5.     Was Acosta harmed? Yes.

14

6. Was Athena's conduct a substantial factor in causing harm to Acosta? <u>Yes</u>.

Was MAS's conduct a substantial factor in causing harm to Acosta? <u>Yes</u>.

7. What are Acosta's total damages?

a. <u>Past economic loss</u>

| | |
|---|---|
| Lost earnings: | $266,000 |
| Medical expenses: | $606,238.75 |
| Total past economic damages: | $872,238.75 |

b. <u>Future economic loss</u>

| | |
|---|---|
| Lost earnings: | $1,500,000 |
| Medical expenses: | $450,000 |
| Total Future Economic Damages: | $1,950,000 |

| | |
|---|---|
| c. Past noneconomic loss: | $1,800,000 |
| d. Future noneconomic loss: | $8,000,000 |
| **TOTAL**: | $12,622,238.75 |

8. Was Acosta negligent? <u>No</u>.

9. Was Acosta's negligence a substantial factor in causing his harm? [Not answered.]

10. Was The Roof Depot negligent? <u>No</u>.

11. Was The Roof Depot's negligence a substantial factor in causing Mr. Acosta's harm? [Not answered.]

12. What percentage of responsibility for Plaintiff Louis Acosta's harm do you assign to the following:

| | |
|---|---|
| Athena Management, Inc.: | 80% |
| MAS Realty: | 20% |
| The Roof Depot: | 0% |
| Louis Acosta: | 0% |
| **TOTAL:** | 100% |

15

### D.    Judgment and post-trial motions.

Defendants filed motions for judgment notwithstanding the verdict and for a new trial.  The trial court denied both motions.  Defendants timely appealed from the judgment.

### DISCUSSION

Defendants contend substantial evidence did not support the jury's verdict because the evidence was undisputed that Acosta knew or reasonably should have known of the hazards— i.e., that the roof hatch was broken and the ladder did not extend to the roof—and there was a visible warning of the broken hatch. In the alternative, defendants contend they are entitled to a new trial because the trial court prejudicially misinstructed the jury, there were errors in the special verdict form, and the damage award was excessive, among other things.

As we discuss, under *Privette* and its progeny, a property owner who hires an independent contractor may be liable to the contractor's employee for injuries sustained on the job only if the owner exercises retained control over any part of the contractor's work in a manner that affirmatively contributes to the worker's injuries, or the employee is injured by a concealed hazardous condition that is unknown and not reasonably ascertainable by the contractor.  In the present case, Acosta does not contend that defendants exercised any retained control over the work site, and the undisputed evidence established as a matter of law that Acosta and his employer could reasonably have ascertained the hazardous condition of the hatch and ladder.  Accordingly, we will direct entry of judgment for defendants.

16

# I.    Standard of review.

" 'We will reverse a jury's verdict only if it is unsupported by any substantial evidence, meaning to prevail on appeal defendants must show that the evidence was such as would justify a directed verdict in their favor.' " (*Kim v. TWA Construction, Inc.* (2022) 78 Cal.App.5th 808, 837.)  Under this standard, we consider "whether a reasonable trier of fact could have found for the respondent based on the entire record." (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1282.)  In doing so, we "consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614.)

# II.   Applicable law.

## A.    The *Privette* doctrine.

In *Privette*, *supra*, 5 Cal.4th 689, our Supreme Court considered whether a landowner was liable for injuries sustained by an independent contractor's employee who fell off a ladder while carrying hot tar up to a roof during a roof installation.  The court held that the common law doctrine of peculiar risk—which provided that landowners were vicariously liable for injuries to third parties resulting from the negligence of independent contractors performing inherently dangerous work on the landowners' property—did not apply to injuries sustained by the independent contractor's own employees.  (*Id.* at pp. 691–692.) The court explained that the peculiar risk doctrine was meant to ensure that third parties received compensation from the landowner who benefitted from the work in the event the

17

independent contractor was insolvent.  (*Id*. at p. 701.)  The availability of workers' compensation, however, eliminated this concern as to the contractor's own employees by ensuring that those employees will receive some compensation for their injuries.  (*Id*. at pp. 701–702.)  Further, allowing a contractor's employees to sue the hirer would "produce[ ] the anomalous result that a nonnegligent person's liability for an injury is greater than that of the [independent contractor] whose negligence actually caused the injury."  (*Id.* at p. 698.)

Since *Privette*, our Supreme Court has "repeatedly reaffirmed the basic rule that a hirer is typically not liable for injuries sustained by an independent contractor or its workers while on the job.  [The] more recent cases emphasize delegation as the key principle underlying this rule:  Because the hirer presumptively delegates to the independent contractor the authority to determine the manner in which the work is to be performed, the contractor also assumes the responsibility to ensure that the worksite is safe, and the work is performed safely.  (*SeaBright* [*Ins. Co. v. US Airways, Inc*. (2011) 52 Cal.4th 590], 600 [(*SeaBright*)].)  This rule applies even where the hirer was at least partially to blame due to its negligent hiring (*Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1238) or its failure to comply with preexisting statutory or regulatory workplace safety requirements (*SeaBright*, at p. 594).  It also applies to a solo independent contractor who has no employees and who has declined to obtain workers' compensation insurance, such that the contractor will receive no coverage for his or her injuries.  (*Tverberg v. Fillner Construction, Inc*. (2010) 49 Cal.4th 518, 521 (*Tverberg*).)"  (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 41–42 (*Gonzalez*).)

Our high court has identified just two situations in which a hirer may be liable to an independent contractor's employees for a workplace injury.  In *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 202 and *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225, the court held that a hirer may be liable if it exercises retained control over any part of the independent contractor's work in a manner that affirmatively contributes to the worker's injuries.  Subsequently, in *Kinsman, supra*, 37 Cal.4th 659, the court held that a landowner may be liable for injuries to an independent contractor's employee that were caused by a concealed hazard.  Since the concealed hazard exception is a critical issue in this appeal, we will discuss it in some detail.

*Kinsman* was brought by a plaintiff employed by an independent contractor who performed scaffolding work at defendant Unocal's refinery.  After developing mesothelioma as a result of exposure to asbestos at the refinery, the plaintiff sued Unocal for premises liability and negligent exercise of retained control.  (*Kinsman, supra*, 37 Cal.4th at pp. 664–665.)  A jury found for plaintiff on the premises liability theory only, and Unocal appealed.  (*Id.* at p. 666.)  The Supreme Court granted review and ordered a new trial.  (*Ibid.*)

The Supreme Court explained that under common law principles, a landowner can be liable for injuries to invitees caused by a condition of the property of which the landowner is or should be aware.  (*Kinsman, supra*, 37 Cal.4th at p. 673.)  Under *Privette*, however, the hirer generally delegates to an independent contractor the responsibility for supervising a job, including taking proper precautions to protect against obvious hazards.  Thus, when there is a known safety hazard on a hirer's

19

premises, "a corollary of *Privette* and its progeny is that the hirer generally delegates the responsibility to take such precautions to the contractor, and is not liable to the contractor's employee if the contractor fails to do so." (*Id.* at pp. 673–674.)  However, "if the hazard *is concealed* from the contractor but known to the landowner, the rule must be different.  A landowner cannot effectively delegate to the contractor responsibility for the safety of its employees if it fails to disclose critical information needed to fulfill that responsibility, and therefore the landowner would be liable to the contractor's employee if the employee's injury is attributable to an undisclosed hazard." (*Id.* at p. 674, italics added.)  The court thus announced the following rule:  "[T]he hirer as landowner may be independently liable to the contractor's employee, even if it does not retain control over the work, if:  (1) it knows or reasonably should know of a concealed, preexisting hazardous condition on its premises; (2) the contractor does not know and could not reasonably ascertain the condition; and (3) the landowner fails to warn the contractor." (*Id.* at p. 675.)

As a corollary to this rule, the court explained that the responsibility for job safety delegated to independent contractors "may and generally does include explicitly or implicitly a limited duty to inspect the premises." (*Kinsman*, *supra*, 37 Cal.4th at p. 677.)  Accordingly, "the landowner would not be liable when the contractor has failed to engage in inspections of the premises implicitly or explicitly delegated to it.  Thus, for example, an employee of a roofing contractor sent to repair a defective roof would generally not be able to sue the hirer if injured when he fell through the same roof due to a structural defect, inasmuch as inspection for such defects could reasonably be implied to be

20

within the scope of the contractor's employment. On the other hand, if the same employee fell from a ladder because the wall on which the ladder was propped collapsed, assuming that this defect was not related to the roof under repair, the employee may be able to sustain a suit against the hirer. Put in other terms, the contractor was not being paid to inspect the premises generally, and therefore the duty of general inspection could not be said to have been delegated to it. Under those circumstances, the landowner's failure to reasonably inspect the premises, when a hidden hazard leads directly to the employee's injury, may well result in liability." (*Id.* at pp. 677–678.) The court noted, moreover, that there was no reason to distinguish conceptually between premises liability based on a hazardous substance that is concealed because it is invisible to the contractor and known only to the landowner and premises liability based on a hazardous substance that is visible but is known to be hazardous only to the landowner. It explained: "If the hazard is not reasonably apparent, and is known only to the landowner, it is a concealed hazard, whether or not the substance creating the hazard is visible." (*Id.* at p. 678.)

Applying these principles to the case before it, the court held that the jury had not been properly instructed. (*Kinsman, supra,* 37 Cal.4th at p. 681.) The trial court had instructed the jury pursuant to BAJI No. 8.01 that the owner of the premises is under a duty to exercise ordinary care in the use and management of the premises, and that failing to do so is negligence. (*Kinsman,* at p. 681.) The Supreme Court held that this instruction, while an accurate statement of premises liability generally, "is partly erroneous when applied to the present situation." It explained: "[T]he landowner who has delegated job

21

safety to the independent contractor only has a duty to the employee if the condition is concealed.  Because the general premises liability instruction given does not make clear that the hazard must have been unknown and not reasonably ascertainable to the independent contractor that employed Kinsman and to other contractors working contemporaneously on the premises—the jury instruction was in error." (*Id.* at p. 682.) Further, the court said, the instructional error was prejudicial: "Although the jury, in finding Unocal negligent under a premises liability theory, implicitly found that Unocal knew or should have known of the hazard of asbestos dust on its property, it made no finding about whether Kinsman's employer . . . knew or should have known of the hazard . . . .  As discussed, a finding that [the employer] did know that the dust in the refinery was asbestos and was hazardous to an employee like Kinsman, would, under the principles articulated in the *Privette* line of cases and in this opinion, completely relieve Unocal of liability for any resultant employee injury.  [¶]  Whether a hazard is concealed is a factual matter, and the record before us is inconclusive on this issue.  On the one hand, there is no evidence in the record before us regarding whether [Kinsman's employer] knew about the hazards of asbestos or even whether asbestos was present. . . .  [¶]  On the other hand, the various reports issued to the oil industry in the 1930's and 1940's, from which Unocal obtained its knowledge, were not secret or classified, and there was a limited public knowledge about the health hazards of asbestos dust." (*Id.* at pp. 682–683.)   In short, "a properly instructed jury may have concluded, based on the record before us, that the contractors knew or should have known about the airborne asbestos hazard, which would have meant a verdict in Unocal's favor.  But the

22

evidence does not compel that conclusion.  Because the evidence is capable of inferences in both Kinsman's and Unocal's favor, and because the concealed hazards issue was never properly submitted to the jury, it is appropriate to reverse the judgment and to remand for a new trial on that issue." (*Id*. at p. 683.)

The Supreme Court considered a related issue in *Gonzalez*, *supra*, 12 Cal.5th 29.  There, the plaintiff, a professional window washer, was seriously injured while cleaning skylights on a homeowner's roof.  The plaintiff sued the homeowner, claiming the accident happened because the roof lacked a guardrail and the homeowner failed to properly maintain the roof. (*Id*. at pp. 39–40.)  The plaintiff conceded that he knew of these conditions before beginning the job, but he said he had previously reported the roof's dangerous condition to the homeowner, who had not repaired it. (*Id*. at p. 40.)

The Supreme Court affirmed the grant of summary judgment for the homeowner.  It explained that once an independent contractor becomes aware of a hazard on a property owner's premises, the responsibility for employee safety is delegated to the contractor as a matter of law, and the owner has no duty to protect the employee if the contractor fails in that task. (*Gonzalez*, *supra*, 12 Cal.5th at p. 45, citing *Kinsman*, *supra*, 37 Cal.4th at p. 674.)  This was so, the court said, even where the property owner was aware of the hazard and there were no reasonable safety precautions the contractor could have adopted to protect against the hazard. (*Gonzalez*, at p. 45.)  The court explained: "A rule establishing landowner liability for a known hazard where there were no reasonable safety precautions the contractor could have adopted to protect against the hazard would turn *Privette*'s presumption of delegation on its head by

requiring the landowner to affirmatively assess workplace safety. The landowner would need to determine whether the contractor is able to adopt reasonable safety precautions to protect against the known hazard and, if not, to remedy the hazard. This makes little sense given that a landowner typically hires an independent contractor precisely because of the contractor's expertise in the contracted-for work and the hirer usually has no right to interfere with the contractor's decisions regarding safety or otherwise control the contractor's work. [Citations.] Our conclusion in *Kinsman* that a landowner delegates all responsibility to independent contractors to ' "protect themselves against" ' a known hazard (*Kinsman*, at p. 674, italics omitted), coupled with the principles underlying *Privette*'s straightforward rule that a hirer of an independent contractor delegates to the contractor all responsibility for workplace safety (see *Privette*, at p. 693; *SeaBright*, *supra*, 52 Cal.4th at p. 597), leads us to reject a rule that would allow a contractor to recover in tort so long as it proves it was unable to adopt reasonable safety precautions in the face of a known hazard." (*Gonzalez*, at pp. 45–46.)

In so concluding, the Supreme Court rejected the plaintiff's contention that the *Privette* doctrine applies only where the independent contractor is specifically tasked with repairing the hazard or where the hazard was created by the work for which the contractor was retained. The court explained: "Gonzalez's argument goes well beyond the rule adopted by the Court of Appeal and fails on its merits for at least two reasons. First, Gonzalez's view of the risk inherent to his work is overly narrow: It cannot be seriously disputed that cleaning a skylight will always entail at least some risk of falling off a roof. Second,

24

Gonzalez's position is contrary to our holdings in *Tverberg*[2] and *Kinsman*. We recognized in *Tverberg* that the bollard holes that caused the independent contractor's injury were wholly unrelated to his task of constructing a metal canopy. (*Tverberg*, *supra*, 49 Cal.4th at p. 523 ['The bollards had no connection to the building of the metal canopy, and [the independent contractor] had never before seen bollard holes at a canopy installation'].) The contractor also did not create the hazard; the holes were dug by a different subcontractor for a different purpose. (*Id.* at p. 522.) Nevertheless, we determined that the doctrine of peculiar risk does not apply when an independent contractor 'seeks to hold the general contractor vicariously liable for injuries arising from risks inherent in the nature *or the location* of the hired work over which the independent contractor has, through the chain of delegation, been granted control.' (*Id.* at pp. 528–529, italics added.) Since the proximity of the bollard holes to the location where the canopy was to be constructed made 'the possibility of falling into one of those holes . . . an inherent risk of" the contractor's work, the contractor—and not the hirer—was responsible for protecting himself against that risk. (*Id.* at p. 529.) Similarly, in *Kinsman*, the independent contractor was hired to install scaffolding and not to remove or remediate the asbestos hazard. (*Kinsman*, *supra*, 37 Cal.4th at p. 664.) The plaintiff's exposure to asbestos was also not caused by his work; instead, the work of other contractors generated asbestos dust

---

2     *Tverberg* was an action by the employee of a subcontractor hired to erect a metal canopy over fuel-pumping units at a commercial fuel facility. The employee was injured when he fell into a large hole dug to erect a concrete post called a "bollard." (*Tverberg*, *supra*, 49 Cal.4th at pp. 522–523.)

and debris to which the plaintiff was exposed.  (*Ibid*.)  We did not hold that the landowner in *Kinsman* could be liable because the hazard was not inherent to the contractor's work.  Instead, we held that the landowner could be liable if the asbestos hazard was unknown to and undiscoverable by the contractor and the landowner failed to warn of it, irrespective of the fact that the contractor did not create the hazard and was not hired to remediate the hazard.  (*Id*. at pp. 675, 683.)  As these and our other *Privette* cases make clear, a hirer presumptively delegates to an independent contractor all responsibility for workplace safety, such that the hirer is not responsible for any injury resulting from a known unsafe condition at the worksite— regardless of whether the contractor was specifically tasked with repairing the unsafe condition and regardless of whether the danger was created by the work for which the contractor was retained." (*Gonzalez*, *supra*, 12 Cal. 5th at pp. 51–52.)

Applying these principles, the court held that summary judgment had properly been granted for the homeowner: "Gonzalez contends that Mathis's roof was hazardous because the skylight could only be cleaned while walking along an unreasonably narrow path between the parapet wall and the roof's exposed edge and, due to Mathis's years-long failure to maintain the roof, this path was slippery and covered in loose sand, gravel, and rocks.  Gonzalez additionally argues that he was not hired to and lacked the expertise necessary to repair the roof or change the permanent fixtures on the roof such that he and his workers could clean the skylight safely.  Thus, Gonzalez concludes, Mathis's duty to maintain the roof in a reasonably safe condition was never delegated to him.  But while Mathis may not have delegated any duty to repair the roof or make other

26

structural changes to it, Mathis did delegate to Gonzalez a duty to provide a safe workplace to his workers and to perform the work for which he was retained in a safe manner.  This encompassed a duty on Gonzalez's part to assess whether he and his workers could clean the skylight safely despite the existence of the known hazardous conditions on the roof.  It would be contrary to the principles underlying *Privette* to hold that Mathis also had a duty to determine whether the work could be performed safely absent remediation of a known hazard.  Landowners, like Mathis, hire independent contractors precisely because of their expertise in the contracted-for work.  This expertise puts contractors in a better position to determine whether they can protect their workers against a known hazard on the worksite and whether the work can be performed safely despite the hazard." (*Gonzalez*, *supra*, 12 Cal.5th at p. 54.)  The court noted, however, that this holding "applies only to hazards on the premises of which the independent contractor is aware *or should reasonably detect*.  [Citation.]  Although we recognized in *Kinsman* that the delegation of responsibility for workplace safety to independent contractors may include a limited duty to inspect the premises ([*Kinsman*, *supra*, 37 Cal.4th] at p. 677), it would not be reasonable to expect Gonzalez to identify every conceivable dangerous condition on the roof given that he is not a licensed roofer and was not hired to repair the roof (see *id.* at pp. 677–678).  Here, however, it is undisputed that Gonzalez was aware of the roof's dangerous conditions.  Consequently, Gonzalez had a duty to determine whether he and his workers would be able to clean the skylight safely despite the known dangerous conditions." (*Gonzalez*, at pp. 54–55, italics added.)

27

## B. Subsequent appellate decisions.

Two recent appellate decisions provide additional guidance about the application of the *Privette* doctrine in the context of an allegedly concealed hazard.  In *Johnson v. The Raytheon Co., Inc.* (2019) 33 Cal.App.5th 617 (*Johnson*), the plaintiff was employed by an independent contractor that provided maintenance engineering for defendant Raytheon.  The plaintiff was seriously injured on Raytheon's premises when he fell from a ladder he had climbed to investigate a low-water alarm in one of Raytheon's cooling towers.  (*Id.* at p. 621.)  The ladder had been left behind by another contractor; it was the upper half of an extension ladder and contained a warning label that said:  " 'CAUTION' and 'THIS LADDER SECTION IS NOT DESIGNED FOR SEPARATE USE.' " (*Id.* at p. 622.)  The plaintiff did not see the warning and was injured when the ladder slipped out from under him.  (*Id.* at pp. 622–623.)

The plaintiff sued Raytheon, among others, for negligence and premises liability.  (*Johnson, supra*, 33 Cal.App.5th at p. 623.)  The trial court granted summary judgment for Raytheon, and the Court of Appeal affirmed.  It noted that under *Kinsman*, a hiring defendant is liable only if (1) it knew, or should have known, of a latent or concealed preexisting condition on its property; (2) the independent contractor did not know and could not reasonably have discovered the hazardous condition; and (3) the hirer failed to warn the contractor about the condition.  (*Id.* at p. 631.)  In the case before it, the court held that the plaintiff could not establish the second factor—that plaintiff's employer could not have reasonably discovered the hazardous condition.  The court noted that the ladder was clearly marked with a " 'caution' " sticker, which identified it as a partial

28

extension ladder not to be used without the other part. (*Id.* at p. 632.) Further, although it was dark, the plaintiff had a flashlight, and "[i]f he had inspected the ladder, he would have discovered the danger it presented." (*Ibid.*)[3] Finally, the court rejected the plaintiff's contention that his own failure to use due care would be relevant only to comparative negligence and would not absolve Raytheon of liability. The court explained that the case on which the plaintiff relied involved the dangerous condition of public property and was not a *Privette/Kinsman* case. Under *Kinsman*, the relevant test is whether the independent contractor could reasonably have discovered the latent hazardous condition—a test that "[is] defeated where, as here, there is undisputed evidence that the hazard could reasonably have been discovered (by inspecting the ladder) and, once discovered, avoided (by getting another ladder)." (*Johnson*, at p. 632.)

The court reached a similar result in *Blaylock v. DMP 250 Newport Center, LLC* (2023) 92 Cal.App.5th 863 (*Blaylock*). There, the plaintiff was employed by an independent contractor hired to maintain and service HVAC equipment on the roof of a commercial building owned by the defendant. The HVAC equipment was connected to ductwork that penetrated the roof

---

[3] The court rejected plaintiff's contention that the warning was inadequate because it did not notify him that the extension ladder posed a safety hazard. It explained: "[T]he caution label states, 'CAUTION. THIS LADDER SECTION IS NOT DESIGNED FOR SEPARATE USE.' To the extent Johnson suggests that the label must specifically warn of serious bodily injury, we disagree." (*Johnson, supra*, 33 Cal.App.5th at p. 632, fn. 10.)

into a crawl space between the roof and the ceiling of the floor below.  The "floor" of the crawl space was wallboard panels that covered the ceiling joists below, and was partially covered by plywood.  The "floor" also contained an access panel (referred to in the opinion as a "trap door") that permitted access from the crawl space to a utility room below.  From the crawl space, the access panel presented as a square plywood surface that sat below the ceiling joists that framed it on all four sides.  Plaintiff and his coworkers were not aware of the access panel.  While working in the crawlspace, the plaintiff fell through the access panel onto the floor below, suffering a serious injury.  (*Id.* at pp. 866–867, 872.)

The plaintiff sued the building owner for premises liability and negligence.  The trial court granted summary judgment for the building owner, and the plaintiff appealed, urging that there were triable issues of material fact about whether the access panel qualified as a hazard that was concealed from workers inside the crawl space.  (*Blaylock*, *supra*, 92 Cal.App.5th at pp. 868–869, 872.)  Specifically, the plaintiff asserted that the access panel could not be seen from inside the crawl space because it was covered with the same plywood that covered most of the crawl space floor; the crawl space was dimly lit; the access panel's hinge was not visible from within the crawl space; and none of the contractor's employees, including the plaintiff, recognized it as an access panel.  (*Id.* at p. 872.)

The Court of Appeal affirmed the grant of summary judgment for the building owner.  It explained:  "First, the suggestion that the trap door was concealed because the lighting inside the crawl space was inadequate is not persuasive.  As noted *ante*, 'when there is a known safety hazard on a hirer's

30

premises that can be addressed through reasonable safety precautions on the part of the independent contractor, a corollary of *Privette* and its progeny is that the hirer generally delegates the responsibility to take such precautions to the contractor, and is not liable to the contractor's employee if the contractor fails to do so.' (*Kinsman, supra*, 37 Cal.4th at pp. 673–674.) Inadequate lighting in the crawl space is the kind of known hazard that falls within that rule; it was [the contractor's] responsibility to ensure the workspace was adequately lit to ensure worker safety.

"Second, the fact that neither [plaintiff] nor his coworkers noticed any safety concerns in the crawl space, and none had recognized the panel [plaintiff] fell through as a 'trap door,' is not sufficient to suggest the trap door was concealed from the perspective of [the contractor]. [The contractor] had a duty to inspect the work premises for potential safety hazards; [plaintiff] offers no evidence that any such inspection occurred.

"The photographs in our record demonstrate that, had [the contractors'] employees engaged in a safety inspection of the premises, they would have seen the plywood panel which turned out to be the sealed 'trap door' exposed in the crawl space as the wallboard 'floor' laid across the top of the joists was cut around it. That recognition might well have revealed the existence of the sealed 'trap door.'

"A reasonable inspection would have also revealed that the exposed plywood surface was attached to the *bottom* of the joists, rather than the top of them. The [contractor's] employees would thus have recognized the plywood functioned as part of the ceiling of the room below, rather than part of the floor of the crawl space.

31

"Third, [plaintiff] ignores the undisputed evidence which reflected that the [contractor's] employees were trained that when working in a crawl space between the roof of a building and the ceiling of the interior space below, they could not assume the surfaces below them would hold their weight. They were trained to check any flooring before putting their weight on it, to move around on all fours as much as possible to distribute their weight, and to do their best to stay on top of the floor joists . . . because stepping onto other surfaces would risk going 'through the drywall or through the ceiling.' [Fn. omitted.]

"Based on that undisputed evidence, we conclude, as a matter of law, if [the contractor] (i.e., [plaintiff] and his coworkers) inspected the premises for safety issues, they would have recognized that the access panel which appeared to be part of the ceiling below the joists, was unsafe to walk on. [Fn. omitted.]

"We consequently reject [plaintiff's] contention there is a triable issue of fact about whether the plywood panel's status as a 'trap door' was concealed from [the contractor] and its employees. Whether or not it could be readily identified as a 'trap door,' its hazardous nature was not concealed from the workers in the crawl space." (*Blaylock*, *supra*, 92 Cal.App.5th at pp. 872–873.)

With these principles in mind, we now turn to the facts of the present case.

III. **The jury's verdict is not supported by substantial evidence because the hazardous condition of the roof hatch and ladder were not concealed as a matter of law.**

Defendants contend that under the cases discussed above, the hazard presented by the roof hatch and ladder were not

32

concealed as a matter of law. For the reasons that follow, we agree.

As discussed above, under *Kinsman*, a landowner may be liable for an injury to an independent contractor's employee, even if it does not retain control over the work, if "(1) it knows or reasonably should know of a concealed, preexisting hazardous condition on its premises; (2) the contractor does not know and could not reasonably ascertain the condition; and (3) the landowner fails to warn the contractor." (*Kinsman*, *supra*, 37 Cal.4th at p. 675.) In other words, a landowner who fails to warn a contractor of a known hazardous condition on its property can be liable to the contractor's employee only if the contractor does not know *and cannot reasonably ascertain* the condition. Further, a contractor has a duty to inspect the work site to identify safety hazards before beginning work. (*Id.* at p. 677 ["the responsibility for job safety delegated to independent contractors may and generally does include explicitly or implicitly a limited duty to inspect the premises"]; *Gonzalez*, *supra*, 12 Cal.5th at p. 54 ["the delegation of responsibility for workplace safety to independent contractors may include a limited duty to inspect the premises"]; *Blaylock*, *supra*, 92 Cal.App.5th at p. 873 [contractor "had a duty to inspect the work premises for potential safety hazards"].)

In the present case, it is undisputed that the hazardous condition of the ladder—that it did not reach all the way to the roof—was not concealed. Acosta admitted that he perceived the ladder was short once he opened the hatch, and his expert, Avrit, conceded that it would be apparent before climbing from the ladder onto the roof "that there [is] a two-foot gap between the ladder and roof." Accordingly, the undisputed evidence

established both that Acosta knew of the ladder's condition before he climbed onto the roof and that the condition was reasonably discoverable.

With regard to the hazardous condition of the roof hatch, although the evidence was disputed as to whether Acosta actually knew the compression cylinder was broken before he began climbing onto the roof, the undisputed evidence compels the conclusion that the condition was reasonably ascertainable. Both Acosta and his expert testified that if the compression cylinder had been working properly, it would have pushed the hatch open six to 12 inches once the hatch was unlocked. A properly functioning compression cylinder would also have borne some or most of the weight of the 100-pound hatch. In this case, however, the hatch did not open by itself once it was unlocked and, by Acosta's own admission, it felt "heavier than expected" or "heavier than usual." As a result, Acosta was aware that the hatch was "not working correctly."

Even more significantly, although the broken spring inside the compression cylinder was not visible, the hatch's dangerous condition—that is, the fact that the hatch comes "slamming down" if "the hold-open arm is just touched"—was readily apparent upon inspection. Acosta testified that immediately after the accident his supervisor asked him to try to determine why the hatch had fallen. After confirming that the cylinder was in place, Acosta opened the hatch from the roof and released the locking mechanism. As soon as he did so, "the full weight of the door came all the way down." Because "[t]here was no resistance on that door shutting," Acosta believed "there was either a broken or missing or wrong type of spring that was mounted on [the hatch]." Indeed, Acosta said, although he could not tell

precisely what was wrong with the compression spring, it was "obvious[ ]" that "that spring" was the cause of the accident.

The present case thus is analogous to *Blaylock* and *Johnson*. In *Blaylock*, the hazard was neither obvious nor known to the employee: The access panel was " 'covered with the same plywood that covered most of the crawl space floor' "; the panel's hinge was not visible from within the crawl space; and none of the contractor's four workers recognized it as an access panel. (*Blaylock*, *supra*, 92 Cal.App.5th at p. 872.) Similarly, in *Johnson*, the ladder that caused the plaintiff's injury was easily mistaken for a straight ladder, and plaintiff was unaware the ladder was not designed to be used alone. (*Johnson*, *supra*, 33 Cal.App.5th at p. 622.) Nonetheless, the courts held in both cases that the plaintiffs were barred from recovering because they would have discovered the hazards had they or their employers inspected the premises for safety issues. (*Blaylock*, at p. 873 ["we conclude, as a matter of law, if [the contractor] (i.e., Blaylock and his coworkers) inspected the premises for safety issues, they would have recognized that the access panel which appeared to be part of the ceiling below the joists, was unsafe to walk on"]; *Johnson*, at p. 632 ["If [plaintiff] had inspected the ladder, he would have discovered the danger it presented."].)

The present case is analogous. There is no evidence that Horizon or Acosta conducted a safety inspection of the worksite, and the undisputed evidence demonstrates that an inspection would have revealed its hazardous condition—that is, that the hatch slammed shut as soon as it was unlocked. Accordingly, whether or not Acosta *actually knew* that the roof hatch was broken, its hazardous condition was *reasonably discoverable* as a

35

matter of law. Under *Kinsman*, *Gonzalez*, *Johnson*, and *Blaylock*, therefore, defendants were entitled to judgment.

None of Acosta's contrary contentions persuades us otherwise.[4] First, Acosta contends that neither he nor Horizon had a duty to inspect the roof hatch because it was not within the scope of the work Horizon was hired to do.[5] He notes that the duty to inspect under *Kinsman* and *Gonzalez* is limited, and he suggests that it would not have been reasonable to expect him to identify "every conceivable dangerous condition of the hatch leading to the roof given that he is not a licensed hatch repairer and was not hired to repair the hatch." Thus, he urges, "[t]he hazardous condition of the hatch, which simply provided access to plaintiff's work site, was not delegated to Horizon simply by reason of the fact that he was to work on lighting which might require access to the roof."

---

[4]     Because Acosta's and Horizon's interests are aligned for purposes of this appeal, we will not distinguish between the appellate arguments made by each of them.

[5]     Acosta also contends that defendants waived this issue because they withdrew their request that the trial court instruct the jury that Acosta had a duty to inspect. Not so. "Generally, issues not raised in the trial court cannot be raised on appeal. *'The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule.'*" (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464, italics added, quoting *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17; see also *Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119, 1136 [same].) Defendants' withdrawal of their proposed jury instruction, therefore, did not forfeit their appellate contention that the judgment is not supported by substantial evidence.

We do not agree that the duty to inspect is as limited as Acosta suggests.  He is correct that an independent contractor does not have a duty to inspect all of the landowner's property or to identify hazards wholly outside his area of expertise. (See *Gonzalez*, *supra*, 12 Cal.5th at pp. 54–55 ["it would not be reasonable to expect Gonzalez to identify every conceivable dangerous condition on the roof given that he is not a licensed roofer and was not hired to repair the roof" or to protect himself against "a known hazard on the premises that is not located on or near the worksite"]; *Kinsman*, *supra*, 37 Cal.4th at p. 678 ["the contractor was not being paid to inspect the premises generally, and therefore the duty of general inspection could not be said to have been delegated to it"].)  But a landowner who hires an independent contractor "presumptively delegates to that contractor its tort law duty to provide a safe workplace for the contractor's employees" (*SeaBright*, *supra*, 52 Cal.4th at p. 600), and thus the independent contractor has a duty to determine whether its employees can safely perform the work they have been hired to do (*Gonzalez*, at p. 55).  That includes a duty to inspect not only the worksite itself, but the "means to access the worksite." (*Ibid.*)  Thus, for example, the court rejected the plaintiff's claim in *Gonzalez* that he was not responsible for ensuring the safety of the area of the roof abutting the skylights the plaintiff had been hired to clean.  The court explained: "Gonzalez argues that the path between the parapet wall and the edge of the roof was just a means to access the worksite, as opposed to being a part of the worksite, but this is belied by the undisputed evidence in the record.  The path ran parallel to the skylight and Gonzalez testified that he utilized it *while* cleaning the skylight.  Moreover, even if it were true that Gonzalez was

required to traverse the path just to get to the skylight, it still would have constituted an inherent risk in the job for which he was hired." (*Id.* at p. 55.) Similarly, in *Tverberg*, the court held that the plaintiff could not recover for injuries he suffered when he fell into a hole dug in the area adjacent to where he had been hired to erect a metal canopy. It explained: "Because the bollard holes were located *next to* the area where Tverberg was to erect the metal canopy, the possibility of falling into one of those holes constituted an inherent risk of the canopy work." (*Tverberg*, *supra*, 49 Cal.4th at p. 529, italics added.) And, in *Blaylock*, the court held the plaintiff's employer had a duty to inspect not merely the ducts it was hired to repair, but the crawl space through which the ducts were accessed. (*Blaylock*, *supra*, 92 Cal.App.5th at pp. 866, 872–873.)

In the present case, although Acosta's employer, Horizon, was not hired to inspect or repair the roof hatch, the electrical work for which it was hired required roof access. Because Horizon, through Acosta, chose to access the roof through the roof hatch by means of the fixed ladder, the roof hatch and ladder necessarily were part of the worksite and were within Horizon's duty to inspect. (See *Gonzalez*, *supra*, 12 Cal.5th at p. 48 ["even where an unsafe condition exists on the premises due to the landowner's failure to comply with specific statutory and regulatory duties, the landowner is not liable because *it is the contractor who is responsible for its own workers' safety*"], italics added.) Further, while it "would not be reasonable to expect [Horizon] to identify every conceivable dangerous condition on the roof given that [it] is not a licensed roofer and was not hired to repair the roof" (see *id.* at pp. 54–55), under the cases discussed above, the law attributes to Horizon knowledge of

38

those hazards that a reasonable inspection by a non-roofer would have revealed. As we have discussed, the broken condition of the hatch, and the fact that the ladder did not reach all the way to the roof, were not concealed and would have been apparent had Acosta or Horizon inspected the hatch and ladder. Thus, Horizon is deemed as a matter of law to have been aware of the condition of the hatch and ladder.

Next, Acosta contends that the defect was hidden because the broken spring was not readily visible. Not so. As *Kinsman* explained, the relevant inquiry is whether "*the hazardous condition*" is known or reasonably knowable. (*Kinsman*, *supra*, 37 Cal.4th at p. 675, italics added.) In the present case, the "hazardous condition" was that the roof hatch would slam shut immediately upon being released. The broken spring was the *cause* of the hazardous condition, but was not itself hazardous. Because a reasonable inspection would have revealed the unsafe condition of the hatch, the hazard was not "concealed," even though the cause of the hazardous condition was not readily apparent.

Third, Acosta contends that even if he became aware that the hatch was broken when he began opening it, "any such knowledge [was] not instantaneously imputed to Horizon" because " 'a principal is not affected by the knowledge of an agent until it is communicated to him or until the one having the knowledge has committed a fault either in transacting something for the principal or in failing to communicate it to others who are to act upon it.' " (*Kelley v. British Commercial Ins. Co.* (1963) 221 Cal.App.2d 554, 561.) As a result, Acosta suggests, because he had no meaningful opportunity to communicate his knowledge

39

to Horizon prior to his injury, "there necessarily can be no effective delegation to the contractor to correct that condition."

Acosta's contention misunderstands the nature of the contractor's duty under *Privette* and its progeny. As we have discussed, Horizon, as the independent contractor hired by defendants, had a duty to ensure a safe workplace for its employees and is deemed to have been aware of any hazards that a reasonable inspection of the workplace would have revealed. Whether the independent contractor *actually* inspected, or whether an employee of the independent contractor *actually* communicated an unsafe condition to the contractor, is irrelevant—what matters is whether the hazard would have been revealed by a reasonable inspection. Thus, for example, the court in *Johnson* held that the plaintiff could not recover for his injuries because he "cannot establish that [his employer] could not reasonably have discovered the hazardous condition." (*Johnson*, *supra*, 33 Cal.App.5th at p. 632.) Similarly, the *Blaylock* court held that the plaintiff could not recover because the undisputed evidence established that "if ACS (i.e., Blaylock and his coworkers) inspected the premises for safety issues, they would have recognized that the access panel which appeared to be part of the ceiling below the joists, was unsafe to walk on." (*Blaylock*, *supra*, 92 Cal.App.5th at p. 873.) Similarly here, the information that would have been revealed if Acosta or any other Horizon employee conducted a reasonable inspection of the workplace is attributed to Horizon as a matter of law, regardless of Acosta's actual knowledge or ability to transmit that knowledge to Horizon.

Fourth, Acosta contends that even if he was aware that the hatch was heavier than expected, he cannot be charged with

40

knowledge that the hatch was hazardous.  Again, this contention misunderstands *Privette* and its progeny.  Acosta is correct that under the relevant cases, including *Blaylock*, "knowing [a] condition exists is not the same as knowing or suspecting it could create a hazard." (*Blaylock*, *supra*, 92 Cal.App.5th at p. 874.) But as we have said, the relevant inquiry is not what Acosta *actually* knew, but rather what a reasonable inspection would have revealed.  Because a reasonable inspection would have revealed not only that the hatch was heavier than expected but also that the hatch, once unlocked, would come "slamming down" if the hold-open arm was touched, the distinction between knowledge of a condition and knowledge of a hazard is not relevant to our analysis.

Fifth, Acosta contends that defendants' reliance on *Blaylock* and other cases disregards the applicable standard of review—that is, that because *Blaylock* and *Johnson* were appeals from grants of summary judgment, they are irrelevant to the present appeal from the grant of judgment following a jury trial. Not so.  The standards applicable to nonsuit, directed verdict, and judgment notwithstanding the verdict "are analytically the same and governed by the same rules"—that is, they may be granted only if "the plaintiff has not presented substantial evidence to establish a cause of action." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750.)  A substantial evidence challenge to a verdict following a trial raises the same issues and is subject to the same standard of review. (*Padideh v. Moradi* (2023) 89 Cal.App.5th 418, 435, fn. 11.)  And, a defense motion for summary judgment may be granted only if "the plaintiff has substantiated, or can substantiate, the elements of his or her

41

cause of action with evidence that, if believed, would justify a favorable verdict." (*Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442, 455.) In short, the standard of review in each case is essentially the same: Whether there is evidence sufficient to support a judgment in the plaintiff's favor. The courts' conclusions in *Blaylock* and *Johnson* that the plaintiffs' evidence would not support verdicts in their favor, thus, is equally relevant here.

Finally, Acosta contends that the jury's verdict must be upheld because substantial evidence "amply supported the jury's finding that Acosta acted reasonably and was not at fault." This contention confounds the analytically separate doctrines of negligence and peculiar risk. The court explained in *Kinsman* that an instruction that a landowner was responsible for taking "reasonable" safety precautions, "while an accurate statement of premises liability[6] generally," was erroneous when applied to the case at hand because "the landowner who has delegated job safety to the independent contractor only has a duty to the employee if the condition is concealed." (*Kinsman*, *supra*, 37 Cal.4th at p. 682.) In other words, under *Privette* the relevant question is not whether the plaintiff acted reasonably, but whether the hazard was known or reasonably discoverable by the

---

[6] "The elements of a negligence claim and a premises liability claim are the same: a legal duty of care, breach of that duty, and proximate cause resulting in injury." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158.)

plaintiff or his employer.  The jury's finding that Acosta acted reasonably, therefore, is wholly irrelevant to our analysis.[7]

For all the foregoing reasons, we conclude that substantial evidence did not support the jury's finding that the roof hatch's hazardous condition could not reasonably have been discovered

---

[7] Although not relevant to our analysis, we note that the trial court instructed the jury on negligence (CACI No. 400–411), landowners' nondelegable duties  (CACI No. 3713), and landowner liability to employees of independent contractors for unsafe concealed conditions under *Privette/Kinsman* (CACI No. 1009A).  In other words, the jury was instructed that (1) defendants were negligent if they failed to use reasonable care to prevent harm to Acosta, (2) MAS had a nondelegable duty to keep Arlington Plaza in a safe condition, *and* (3) defendants could be liable to Acosta only if they knew or reasonably should have known of an unsafe concealed condition at Arlington Plaza, and Horizon neither knew nor reasonably could be expected to know of that unsafe concealed condition.  The jury was not told how the separate concepts of negligence, nondelegable duty, and peculiar risk relate to one another for purposes of determining defendants' liability, and the CACI use notes do not appear to give trial courts any guidance about whether negligence and/or nondelegable duty instructions should be given in peculiar risk cases.  Further, CACI No. 1009A does not include a description of the independent contractor's duty to inspect for safety issues, as described in *Kinsman*, *Gonzalez*, *Johnson*, and *Blaylock*.  We urge the Judicial Council and its Advisory Committee on Civil Jury Instructions to consider CACI No. 1009A and its use notes in light of recent decisions, including *Gonzalez*, *Johnson*, and *Blaylock*.

by Horizon.[8]  Because this is an essential element of Acosta's claim, the absence of evidence of this element is dispositive of the appeal.  We therefore will reverse the judgment and direct entry of judgment for defendants.  (Code Civ. Proc., § 629, subd. (c) ["If the motion for judgment notwithstanding the verdict is denied and if a new trial is denied, the appellate court shall, if it appears that the motion for judgment notwithstanding the verdict should have been granted, order judgment to be so entered on appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict."]; *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 624 ["The effect of [Code of Civil Procedure] section 629 is that a reversal on appeal for insufficiency of the evidence concludes the litigation just as it would have been concluded if the trial court had correctly entered judgment notwithstanding the verdict."].)

---

[8]     Having so concluded, we need not consider defendants' other contentions, including that substantial evidence did not support the jury's findings that defendants were aware of the hazard posed by the roof hatch and that defendants did not fail to warn Horizon of the hazard.

44

## DISPOSITION

The judgment is reversed, and the trial court is directed to enter judgment for defendants on the complaint.  Defendants are awarded their appellate costs.


EDMON, P. J.


We concur:


LAVIN, J.


EGERTON, J.

Filed 10/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LOUIS ACOSTA, | B316420 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC717512) |
| v. | |
| MAS REALTY, LLC, et al., | ORDER MODIFYING AND CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |
| Defendants and Appellants; | |
| HORIZON LIGHTING, INC., | |
| Cross-defendant and Respondent. | |

THE COURT:

The opinion in the above-entitled matter filed on September 20, 2023, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports.

It is ordered that the opinion be modified as follows: The final sentence on page 41 is omitted and replaced with the following: And, a defense motion for summary judgment may be granted only if the plaintiff has not, or cannot, "substantiate[] the elements of his or her cause of action with evidence that, if believed, would justify a favorable verdict." (*Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442, 455.)"

[There is no change in judgment.]

_____

EDMON, P. J.            LAVIN, J.            EGERTON, J.